# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

**Eric Denson**

    v.                                    Case No. 1:23-cv-11041-PJB

**Joann Lynds**


## MEMORANDUM AND ORDER

Eric Denson was tried and convicted in Massachusetts state court of first-degree murder and assault and battery with a dangerous weapon. After unsuccessfully moving for a new trial and appealing to the Supreme Judicial Court of Massachusetts (SJC), Denson filed a petition for a writ of habeas corpus in federal court. See 28 U.S.C. § 2254.

Denson does not challenge the state court's factfinding. Instead, his sole argument is that the court's rulings were contrary to or involved an unreasonable application of Supreme Court precedent. See 28 U.S.C. § 2254(d)(1). Denson presents four arguments: (1) the trial court's exclusion of his proposed eyewitness identification expert violated his right to put on a defense; (2) the court's refusal to exclude his in-court identification by a witness who had previously failed to identify him in a photo array violated his right to due process; (3) the court improperly admitted hearsay evidence

in violation of his confrontation and due process rights; and (4) his trial counsel was constitutionally ineffective. See Doc. 18.

The warden opposes Denson's petition on the merits, asserting that he is not entitled to the relief he seeks. Doc. 23. For the reasons stated below, I deny Denson's petition.

## I. <u>BACKGROUND</u>

### A.    <u>Facts Related to Underlying Convictions</u>

The factual background underlying Denson's convictions is repeated here verbatim from the SJC's summary of "the relevant facts the jury could have found."[1] Commonwealth v. Denson, 489 Mass. 138, 140-43 (2022).

On the night of March 13, 2010, the victim [Conor Reynolds] and a number of friends from his high school attended a birthday party at a nightclub (club) in Springfield. The [petitioner] also was present and was seen by a friend of his at the party wearing a black leather jacket and a black and red baseball hat. The club had two doors, one closer to the street with a black mailbox on it (mailbox door) and one further from the street that was being used as the primary entrance to the club (main entry door).

Shortly before 11 P.M., the victim, his girlfriend, and several of their friends were standing in the rear of the club, close to where the mailbox door

---

[1]    Brackets indicate my additions or clarifications within the quoted text. All parentheticals appear in the original.

was located. A physical altercation broke out between members of the victim's group and students from another high school. The victim, who was not involved, approached the group and attempted to break up the fight. An adult chaperone approached and told the victim and his friends that they would have to leave if they did not stop fighting. At the same time, a second adult chaperone brought an unidentified young man to the main entry door and told the owner of the club, who was standing there, that the young man was a troublemaker. The club owner removed him from the club through the main entry door.

As the victim and his girlfriend continued to speak to the first chaperone, a second young man wearing a black leather jacket and a red baseball hat, with dark skin, suddenly approached the victim, "got in his face," and told him to back up. Before the victim could respond, the second young man put his left hand on the victim's right shoulder and stabbed the victim in the neck with a knife. As the assailant brought the knife away from the victim, it nicked the arm of another member of the victim's group [Peter D'Amario], causing him to bleed.

The club owner, returning to the area of the fight after having just ejected the "troublemaker" through the main entry door, saw the second young man holding a knife up to the victim's throat. From behind, the club owner pulled the assailant away from the victim and carried him to the

mailbox door. The assailant wriggled out of the club owner's grasp and fell almost in the threshold of the doorway. The assailant got up and walked away from the club toward a nearby convenience store and gasoline station (gas station).

Two young women who knew the [petitioner] personally, Ashely Hudson and Harmony Alvarado, were standing outside the club when they saw the [petitioner] get thrown out. Hudson testified that she saw the [petitioner] get tackled out of the mailbox door.[2] Alvarado observed another person come up to the [petitioner]. Using the [petitioner's] nickname, "E," the person yelled, "What the fuck are you doing, E? Run." The two men then ran together in the direction of the gas station.

As the club owner was removing the assailant from the club, Michael Shea, a friend of the victim, followed and left the club after the assailant was ejected. Hudson testified that she did not see anyone else being thrown out of the club between the time when the [petitioner] left and the time when Shea came outside. Two other friends of the victim followed close behind Shea. As they ran outside, one of them asked who had stabbed the victim, and the club owner pointed at the person in the red hat, whom Shea was chasing. The two young men ran with Shea to the edge of the gas station property. Shea yelled

---

[2]      Footnote 3 of the SJC opinion states: "Alvarado testified that the [petitioner] was thrown out of the main entry door."

for the person that he was chasing to come back. The person turned around, asked why they were chasing him, and made a threatening gesture.[3] At that point, the pursuit ended, and Shea and the other two friends of the victim returned to the club.

Meanwhile, the [petitioner's] cousin and a friend left the parking lot of the gas station in a sport utility vehicle (SUV) that belonged to the cousin's sister. Both men recognized the [petitioner]. There was another man with the [petitioner] whom neither the cousin nor his friend recognized. At the same time as he saw the [petitioner], the cousin noticed a commotion in the parking lot of the club and saw younger individuals who appeared to be running from the club. The cousin drove back into the gas station parking lot, where the [petitioner] got into the SUV using the rear passenger door and sat behind the front passenger's seat. The person with the [petitioner] said something to the effect of "Get him out of here" or "Bring him home."

The victim, shortly after being stabbed, made his way out of the club to the parking lot through the mailbox door, aided by his girlfriend. A witness who had been inside the club testified that after the assailant was thrown out of the mailbox door, the victim left through the same door seconds later.

---

[3]    Footnote 4 of the SJC opinion states: "Shea testified that the person had his hands in his pockets and looked as if he were going to take his hands out."

Outside the club, the victim had difficulty breathing and was unable to remain standing. He leaned against a vehicle, and his girlfriend helped him to the ground and tried to get him to talk. Police officers who responded to the scene provided the victim with first aid until an ambulance arrived. The victim was transported to a local hospital, where he was pronounced dead.

After the victim was transported to the hospital, police secured the scene and began collecting evidence. Many witnesses described the assailant as a Black man, about five feet, seven inches to five feet, nine inches tall, slim to average build, aged about sixteen to twenty years old, wearing a dark colored or black jacket, a red or black baseball hat, and a grey or black sweatshirt under the jacket. Still photographs taken from surveillance footage at the gas station showed two Black men, one on either side of the gasoline pumps. The man on the left side of the photographs was wearing a red baseball hat, a black jacket, dark pants, and white tennis shoes. Witnesses identified the person on the left side of the gas station photograph as the assailant or as the person who walked, ran, or was chased from the club to the gas station just after the stabbing. Witnesses who knew the [petitioner] personally were shown the gas station surveillance video recording, and each identified the person in the red hat and black jacket as the [petitioner].

6

During a later examination of the SUV, photographs were taken of the interior, and a reddish-brown stain that tested positive for human blood was located in the back seat. A later test revealed that the blood on the back seat likely had come from the victim. A blood sample taken from the rear interior door handle also was tested, and the victim could not be excluded as a contributor.[4] Id.

**B.    Procedural History**

Denson was indicted and tried for the murder of Reynolds and assault and battery with a dangerous weapon on D'Amario. Doc. 14-1 at 401-03. He was found guilty of first-degree murder and assault and battery with a dangerous weapon. Doc. 14-22 at 24-25. The trial court sentenced him to a prison term of one and a half years and one day on the assault and battery count, and a concurrent mandatory sentence of life without parole on the murder count. Id. at 48-49.

Denson moved for a new trial and requested an evidentiary hearing on the grounds that his counsel was constitutionally ineffective. Doc. 14-1 at 21, 23-27. After a hearing at which Denson's attorney testified, Doc. 14-23, the trial court rejected his motion. Doc. 14-1 at 481-522. Denson appealed both the denial of his new trial motion and his convictions to the SJC, which

---

[4]    Here concludes the quoted portion of the SJC opinion.

consolidated the appeals. Id. at 523. The SJC affirmed the convictions and

the denial of the new trial motion. Id. at 625-37. Denson then filed the

instant petition in federal court.

## II.    STANDARD OF REVIEW

A petitioner may seek habeas corpus relief from state court convictions

in federal court under 28 U.S.C. § 2254, as amended by the Antiterrorism and

Effective Death Penalty Act of 1996 (AEDPA). "AEDPA demands that a

federal habeas court measure a state court's decision on the merits against a

series of peculiarly deferential standards.'" Ayala v. Alves, 85 F.4th 36, 54

(1st Cir. 2023) (cleaned up). Under these standards, a writ of habeas corpus

shall not be granted unless the state court decision either (1) "was contrary

to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States," 28 U.S.C. §

2254(d)(1), or (2) "was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

A state court's decision is "contrary to federal law" when it adopts a

rule that "contradicts the governing law set forth in the [United States]

Supreme Court's cases" or "reaches a different result from a Supreme Court

decision under a set of facts that are materially indistinguishable." Rosenthal

v. O'Brien, 713 F.3d 676, 683 (1st Cir. 2013) (cleaned up). To prove that a

state court's decision involved an "unreasonable application of clearly

established Federal law," a petitioner "must show far more than that the state court's decision was merely wrong or even clear error; rather, a petitioner must show that the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement." Etienne v. Edmark, 119 F.4th 194, 198 (1st Cir. 2024) (quoting Shinn v. Kayer, 592 U.S. 111, 118 (2020)) (cleaned up). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000).

This analysis does not end the inquiry. Where the state court was in error, a petitioner must further show in most cases that the error resulted in "actual prejudice" and had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation marks and citations omitted); accord Quintanilla v. Marchilli, 86 F.4th 1, 17 (1st Cir. 2023).

### III.  ANALYSIS

### A.  Contrary to or Unreasonable Application of Federal Law

#### 1.  Exclusion of Eyewitness Identification Expert

Before trial, Denson moved to suppress all evidence of identifications made by thirteen witnesses, arguing that the measures used by investigators

to procure these identifications were unnecessary and impermissibly suggestive. Denson, 489 Mass. at 143. To support his argument, Denson sought to admit the testimony of an expert on eyewitness identification inaccuracies, Dr. Steven Penrod. Id. The trial judge held a Daubert-Lanigan[5] hearing to determine whether Penrod could testify at the suppression hearing. Id. The court declined to allow the testimony, finding that the studies Penrod relied on were unrelated to the type of identifications in the case, while deferring its ruling on whether he could testify at trial. Doc. 14-5 at 80. After the Commonwealth presented its case in chief at trial, the judge conducted a voir dire of Penrod to again determine whether he could testify. Doc. 14-18 at 53-72. The judge excluded the proffered testimony, at which point Denson asked the judge to stay proceedings so that he could move for a mistrial. Id. at 81. The court denied Denson's motion. Id. at 81-84.

Denson claims that the trial court's erroneous exclusion of his proffered eyewitness identification expert testimony violated his constitutional right to put on a complete defense. Doc. 18 at 13. Denson acknowledges that no Supreme Court case has directly held that a defendant has a constitutional

---

[5]    Prior to admitting expert testimony, a judge holds a hearing to assess "whether the reasoning or methodology underlying the [expert] testimony is scientifically valid . . . whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Commonwealth v. Lanigan, 419 Mass. 15 (1994).

right to present eyewitness identification expert testimony. Id. at 17-20. Still, to the extent that Supreme Court precedent indirectly addresses his claim, I must assess whether the SJC's decision was contrary to or an unreasonable application of that clearly established federal law. See § 2254(d)(1).

The Constitution guarantees criminal defendants a "meaningful opportunity to present a complete defense." Holmes v. South Carolina, 547 U.S. 319, 324 (2006). A state court's erroneous exclusion of defense evidence may violate both a criminal defendant's Fifth Amendment due process right to a fair trial and his Sixth Amendment right to present a defense. See Chambers v. Mississippi, 410 U.S. 284, 294-95, 302-03 (1973). That said, "a defendant's right to present relevant evidence is not unlimited, but rather subject to reasonable restrictions" and may "bow to accommodate other legitimate interests in the criminal trial process." United States v. Sheffer, 523 U.S. 303, 308 (1998) (cleaned up). Excluding evidence violates a defendant's right to present a defense only where (1) the exclusion is "arbitrary" or "disproportionate to the purposes they are designed to serve" and (2) its exclusion has "infringed upon a weighty interest of the accused." Id. Furthermore, "not every ad hoc mistake in applying state evidence rules [. . .] should be called a violation of due process; otherwise, every significant state court error in excluding evidence offered by the defendant would be a basis for undoing the conviction." Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir.

2001). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

The only Supreme Court case Denson cites to directly support his claim is Washington v. Texas, 388 U.S. 14 (1967), in which the Court held that a state trial court violated a defendant's right to compulsory process by preventing a witness from taking the stand "who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." Id. at 23. The facts here are not at all similar to those in Washington, nor do they resemble the handful of other cases cited in the warden's brief in which the Supreme Court found that the exclusion of witness testimony violated the defendant's right to a complete defense. See, e.g., Chambers, 410 U.S. at 302 (state "voucher" rule prevented defendant from examining adverse witness who had repudiated a prior confession of murder); Crane v. Kentucky, 476 U.S. 683, 691 (1986) (complete exclusion of proffered testimony on circumstances under which defendant had made confession); Holmes, 547 U.S. at 329-31 (state rule governing third party culprit evidence was arbitrary). The government argues, and I agree, that these cases involved egregious exclusions of highly probative evidence essential to the defense. Nothing so damaging occurred in Denson's case.

12

Here, the trial court excluded Penrod's testimony because it determined the testimony was not relevant to the kinds of clothing-based identifications present in the case and would thus be unhelpful to the jury. Doc. 14-18 at 77-78. During voir dire, Penrod told the trial judge about studies he had relied on in finding that witness confidence is the primary influence on a jury's assessment of the accuracy of an eyewitness's identification. Denson, 489 Mass. at 145. Penrod acknowledged that the studies dealt with facial identifications rather than clothing-based identifications. Id. He outlined studies on how factors like viewing conditions, stress, exposure time, and race influence identification accuracy. Id. He also discussed studies on facial identifications from surveillance video footage. Id. Finally, he testified to a study regarding "clothing bias" and how clothing affects how witnesses identify people in facial arrays. Id. The trial judge concluded that the studies were only "remotely related" to the case and stated that "the studies in and of themselves are more peripheral than direct in the sense that nothing is specific regarding the clothing identification per se[.]" Doc. 14-18 at 77-78. Thus, the judge determined that the jury would be capable of evaluating the strength of eyewitness testimony and the misidentification defense without Penrod's testimony. Id. at 78-79.

After reviewing the record, Penrod's voir dire testimony, and the judge's jury instructions on eyewitness identification, the SJC determined

that the exclusion of Penrod's testimony was a proper exercise of the trial court's discretion. Denson, 489 Mass. at 146-47. The SJC found that Penrod's testimony during voir dire supported the trial judge's finding that the studies relied upon did not relate sufficiently to the facts of the case. Id. at 145. While the SJC acknowledged that it had recently revised the recommended jury instructions on eyewitness identification in 2015 (after Denson's trial), it noted that the jury instructions in Denson's trial "nevertheless surpassed what was legally sufficient to address some of the specific issues that the [petitioner] sought to raise through the eyewitness expert's testimony." Id. at 146. The SJC found that the trial judge went beyond Commonwealth v. Rodriguez, 378 Mass. 296, 310-11 (1979), the prevailing recommendation in Massachusetts at that time for such jury instructions. Denson, 489 Mass. at 146. The trial judge had instructed the jury on issues of honest but mistaken identification, erroneous perception, witness forgetfulness, and witness confusion. Id. Given these instructions, the SJC concluded there had been no abuse of discretion in deciding to exclude Denson's proffered expert testimony.[6] Id.

---

[6]    While Denson likely disagrees with the characterization of Penrod's testimony as being only "remotely related" to the case, its absence did not deprive him of the defense of mistaken identification. To the extent Denson argues that Penrod's testimony became necessary after Shea's surprise in-court facial identification, that identification testimony was sufficiently

For these reasons, the SJC's ruling in this case was neither contrary to, nor an unreasonable application of, clearly established federal law relating to the right to present evidence and make a complete defense in criminal trials.[7]

2.    Admission of In-Court Identification

Shea, one of the victim's friends who was present at the stabbing and who chased the assailant outside to the nearby gas station, testified at the trial. Doc. 14-7 at 241, 224-25. Although Shea initially failed to identify Denson in a police photo array, he later identified an individual in a still photograph taken from gas station surveillance footage as the assailant. Doc. 14-1 at 422. At trial, Shea volunteered without prompting to identify Denson as the assailant. Doc. 14-8 at 12-14. After questioning Shea without the jury present, the trial judge permitted the in-court identification. Id. at 31-33, 39.

---

undermined by cross-examination and the trial court's jury instructions to support the trial judge's conclusion that the in-court identification added little to the prosecutor's case. Nor does the trial court's exclusion of Penrod's testimony appear to have infringed on any other "weighty interest" because the need for Penrod's testimony remained low throughout the trial. See Sheffer, 523 U.S. at 308; Brown v. Ruane, 630 F.3d 62, 74 (1st Cir. 2011) (right to present relevant evidence may be limited so long as defendant has adequate opportunity to present his theory of the case).

[7]    I likewise reject Denson's argument that the SJC erred in failing to apply more recent Massachusetts case law concerning eyewitness identification. Doc. 18 at 14-20. Whether the SJC correctly applied its own case law is irrelevant in a habeas analysis. See 28 U.S.C. § 2254(d); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (holding that federal habeas review does not apply to state court decisions on questions of state law which do not implicate federal issues).

Denson claims that the trial court deprived him of due process by permitting an identification that was the product of impermissibly suggestive procedures. Doc. 18 at 26. Denson does not identify a Supreme Court case that the SJC's affirmance of the trial court's decision was contrary to. Instead, he cites the leading cases involving suggestive, out-of-court identifications to support his claim that the SJC's decision was both contrary to and an unreasonable application of clearly established federal law. See id. at 27-28.

For a state court decision to be "contrary to" federal law it must "contradict the governing law set forth in the Supreme Court's cases" or "reach a different result from a Supreme Court decision under a set of facts that are materially indistinguishable." Rosenthal, 713 F.3d at 683 (cleaned up). Section 2254(d)(1) "restricts the source of clearly established law to th[e Supreme] Court's jurisprudence." Williams v. Taylor, 529 U.S. 362, 412 (2000). Here, no clear Supreme Court precedent holds that a witness's failure to identify a defendant during a pretrial identification precludes them from making an in-court identification simply because the circumstances may be inherently suggestive. See Kennaugh v. Miller, 150 F.Supp.2d 421, 432 (E.D.N.Y. 2001), aff'd, 289 F.3d 36 (2d Cir. 2002); United States v. Beeler, 62 F.Supp.2d 136, 141 (D. Me. 1999) (noting that neither the Supreme Court nor the First Circuit have addressed how the constitutionality of this situation

16

should be analyzed). Absent dispositive federal precedent, the admission of Shea's in-court identification cannot have been "contrary to" clearly established federal law.

Denson has also failed to demonstrate that the SJC unreasonably applied Supreme Court precedent. A criminal defendant has a constitutional due process right to be free from identification procedures "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Moore v. Dickhaut, 842 F.3d 97, 101 (1st Cir. 2016) (cleaned up). "Where the likely mistake is 'irreparable,' subsequent courtroom identifications may be similarly prohibited." Id. (quoting Simmons, 390 U.S. at 384). Even where this standard is met, the Constitution does not require automatic exclusion. Id. Where "the indicia of reliability are strong enough to outweigh the corrupting effect of the suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." Id. (quoting Perry v. New Hampshire, 565 U.S. 228, 232 (2012)) (cleaned up). The "central question" is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Neil v. Biggers, 409 U.S. 188, 199 (1972).

The Supreme Court has established a two-part test to determine whether the Due Process clause "requires suppression of an eyewitness

identification tainted by police arrangement." Perry, 565 U.S. at 238-39.

First, I consider whether the identification procedure was suggestive. If it

was not, the inquiry ends. See United States v. Melvin, 730 F.3d 29, 34 (1st

Cir. 2013). If it was suggestive, I must look at whether the identification was

nonetheless reliable. Id. Factors in assessing reliability include "the

opportunity of the witness to view the criminal at the time of the crime, the

witness' degree of attention, the accuracy of his prior description of the

criminal, the level of certainty demonstrated at the confrontation, and the

time between the crime and the confrontation." Manson v. Brathwaite, 432

U.S. 98, 114 (1977). Where indicators of reliability outweigh the

suggestiveness of the procedure, the identification evidence generally should

be admitted, and the jury tasked with determining its ultimate worth. See

Perry, 565 U.S. at 232.

Here, in his initial testimony to police, Shea described the assailant as

an African American male wearing tight jeans, a black leather jacket with a

black hoodie underneath, and a red hat with a white letter C on the front.

Doc. 14-7 at 225-26. In the early morning hours following the stabbing, the

police presented Shea with an array of eight photos, including one depicting

Denson. Doc. 14-8 at 60. Shea was unable to identify anyone in the array. Id.

The next day, however, when police showed Shea a still photograph taken

from the convenience store's surveillance footage on the night of the stabbing,

Shea identified one of the two men in the photo as the assailant he had

chased out of the bar after seeing him run away from the victim.[8] Id. at 65-

66; Doc. 14-1 at 422.

At trial, Shea told the judge during voir dire that he could identify

Denson as the assailant based on his earlier viewing of the surveillance

camera photo. Doc. 14-8 at 31-33. Shea then identified Denson as the

individual who had been wearing a red hat and black leather jacket, who had

been close to the victim after the stabbing, and whom Shea had chased out of

the bar to the convenience store. Id. at 76. On cross, Shea admitted that he

had seen Denson's picture on the news and knew his name. Id. at 100-02.

Denson argued in his appeal to the SJC that because Shea failed to

identify Denson in the out-of-court photo array, his in-court identification

was akin to a "show up" identification in its suggestiveness. Denson, 489

Mass. at 147. Denson asked the SJC to apply its rule in Commonwealth v.

Crayton, 470 Mass. 228, 236 (2014) and Commonwealth v. Collins, 470 Mass.

255, 265 (2014)—both decided after Denson's trial—prohibiting in-court

identifications absent a non-equivocal out-of-court identification, unless

justified for good reason. Denson, 489 Mass. at 147. Denson conceded that the

---

[8]     Shea wrote on the photograph: "100% I chased these guys out of the bar
because I suspected one of them of stabbing my friend Conor. I chased the
one with the red hat out of the bar after seeing him run away from Conor
from about 5 feet away." Doc. 14-1 at 422.

rule applied only prospectively, but nevertheless asked the court to exercise its discretionary authority under General Law c. 278, § 33E and give him the rule's benefit. Id. The SJC found that the admission of the in-court identification was not in error because it was consistent with then-existing state law, and that even under the new rule the evidence did not prejudice him. See id. (noting that even without Shea's identification, "the evidence establishing that the [petitioner] was the assailant was strong"). In response to Denson's argument that the prosecutor had improperly relied on Shea's in-court identification, the SJC noted that the prosecutor relied primarily on the identifications of witnesses who (unlike Shea) knew Denson personally. Id. at 148.

Neither the SJC's affirmance nor the trial court's decision to allow the identification were based on unreasonable applications of Supreme Court precedent. First, nothing about Shea's identification was categorically suggestive. See Melvin, 730 F.3d at 34. In identifying Denson in the courtroom, Shea relied on his own personal knowledge of what the assailant looked like from the night of the stabbing, as well as the surveillance camera image. Second, the state rule concerning in-court identifications was consistent with the federal standard: an in-court identification should be excluded under state law if it was "tainted by an out-of-court confrontation arranged by the Commonwealth that [was] 'so impermissibly suggestive as to

give rise to a very substantial likelihood of irreparable misidentification."

Commonwealth v. Choeurn, 446 Mass. 510, 520 (2006) (quoting Simmons,

390 U.S. at 384). Third, I agree with the SJC that "in light of the evidence at

trial and the prosecutor's closing argument, the impact of Shea's

identification of the defendant likely had a minimal effect on the jury."

Denson, 489 Mass. at 148. Indeed, Denson's counsel thoroughly cross-

examined Shea and brought out the fact that Shea had previously been

unable to identify Denson from the photo array, as well as the fact that Shea

had seen Denson on television. Doc. 14-8 at 100-02. The SJC's decision was

therefore not an unreasonable application of clearly established federal law.

3.    Admission of Hearsay Statement

Brian Failey, who was present at the stabbing, testified at trial about

what he had initially told police he heard following the stabbing. Doc. 14-9 at

192-93. In questioning Failey, the prosecutor referred to a statement

contained in a police report. Id. at 155. The report asserted that Failey had

told the police that he had heard someone say "Eric be buggin'" as people

were scattering. Id. At trial, however, Failey testified that this was incorrect,

and that he had heard someone say, "E be buggin'" or "He be buggin'." Id. at

156. Over Denson's objection that the statement "Eric be buggin'" was

inadmissible hearsay, the trial judge permitted Failey to be questioned using

the report. Id. at 192-93. The SJC later determined that the trial court

21

properly allowed Failey to be questioned about the statement in the police

report because it qualified as a prior inconsistent statement that the jury

could have considered for impeachment purposes. Denson, 489 Mass. at 149.

It also determined that the prosecutor had later improperly used the

statement in the police report for substantive purposes in his closing

argument but that the error was not prejudicial. Id.

Denson argues that the prosecutor's use of Failey's statement at trial

violated his Sixth Amendment right to confront the witnesses against him.[9]

The Confrontation Clause protects a criminal defendant's right to "confront"

witnesses against him. Crawford v. Washington, 541 U.S. 36, 68 (2004).

When, however, "the declarant appears for cross examination at trial, the

Confrontation Clause places no constraints at all on the use of his prior

testimonial statements." Id. at 59 n.9. Further, the Confrontation Clause only

---

[9]    Insofar as Denson argues that the admission of hearsay testimony
violated state evidentiary rules, that complaint cannot furnish the basis for
relief. A federal writ of habeas corpus will not issue to correct errors of state
constitutional, statutory, or procedural law unless a federal issue is also
presented. See 28 U.S.C. § 2254; Estelle, 502 U.S. at 67-68 ("It is not the
province of a federal habeas court to re-examine state-court determinations
on state-law questions."); Palmariello v. Superintendent of MCI Norfolk, 873
F.2d 491, 494 (1st Cir. 1989) ("[H]abeas review does not ordinarily encompass
garden-variety evidentiary rulings."). The court is not reviewing a judgment,
but rather the lawfulness of the petitioner's custody. Coleman v. Thompson,
501 U.S. 722, 730 (1991). A trial court's evidentiary ruling will only provide
the basis for habeas relief "if [the ruling] is so prejudicial that it renders fair
trial impossible." Lagasse v. Vestal, 671 F.2d 668, 669 (1st Cir. 1982). That
was not the case here.

applies to testimonial hearsay. Davis v. Washington, 547 U.S. 813, 823-24 (2006).

Given these precedents, Denson cannot possibly succeed on his Confrontation Clause claim. He cannot claim that he was denied an opportunity to confront Failey about the statement in the police report because Failey testified at trial and was subject to cross-examination. Nor can he base a Confrontation Clause claim on the fact that the statement was originally made by an unknown person who was not subject to cross examination because Denson cannot point to any Supreme Court decision that has treated a statement of that type as testimonial. Accordingly, the SJC's decision to reject Denson's Confrontation Clause claim was neither contrary to nor involved an unreasonable application of Supreme Court precedent.[10]

4.    Ineffective Assistance of Trial Counsel

Attorney Harry Miles, Denson's trial counsel, called Dr. Edward Bernstine, a forensics expert, to comment on blood and DNA evidence and

---

[10]    Denson alleges, without providing any developed argument, that the admission of the "Eric be buggin'" statement also violated his right to due process. The facts of the case, however, simply do not support a claim that either the trial court's evidentiary ruling or the prosecutor's subsequent use of the statement in his closing argument violated Denson's right to due process. See Coningford v. Rhode Island, 640 F.3d 478, 484 (1st Cir. 2011) (describing the narrow circumstances when an erroneous evidentiary ruling could support a habeas corpus claim alleging a violation of due process).

describe purported deficiencies in the Commonwealth's investigation. Doc. 18 at 37. On cross examination, the Commonwealth impeached Bernstine's credibility by asking about three negative performance reviews Bernstine had received while working at the state's crime lab. Doc. 14-19 at 51-52. Attorney Miles's co-counsel, Attorney David Rountree, unsuccessfully moved for a mistrial, claiming ineffective assistance by his co-counsel and stating that she had disagreed with Attorney Miles's decision to call Bernstine. Id. at 92-93.

At a later hearing considering Denson's ineffective assistance of counsel claim, the trial court applied the state constitutional standard for ineffective assistance claims and found that neither counsel's decision to call Bernstine as a witness nor his overall theory of defense were manifestly unreasonable. Doc. 14-1 at 513-16. The court also found that Attorney Miles had called Bernstine on the advice of colleagues and based on his impressive credentials in the field of DNA testing, including his former employment at the state crime lab. Id. at 507-09. Attorney Miles stated he was aware of Bernstine's "baggage" and his susceptibility to impeachment but believed his negative performance reviews were irrelevant to his scientific knowledge and competence to testify. Id. Attorney Miles also testified to the trial court that he chose not to pursue a secondary transfer theory to explain the bloodstains because he thought the weight of the evidence was against it. Id.

Denson claims that the assistance of his counsel was so ineffective as to violate his rights under the Sixth and Fourteenth Amendments, first because counsel called a witness susceptible to impeachment and second because counsel failed to pursue a secondary transfer theory for the source of the bloodstains. Doc. 18 at 41, 43.

Ineffective assistance of counsel claims are governed by the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), under which the defendant must make a two-part showing. See Miller v. United States, 77 F.4th 1, 5-6 (1st Cir. 2023); Logan v. Gelb, 790 F.3d 65, 71 (1st Cir. 2015). "First, the defendant must show that counsel's performance was deficient, which requires showing that counsel's performance was not only substandard, but also deficient in some way sufficiently substantial to deny him effective representation." Logan, 790 F.3d at 71 (cleaned up). "Second, the defendant must show that the deficient performance prejudiced the defense, which requires proof that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (cleaned up); accord Andrus v. Texas, 590 U.S. 806, 813-14 (2020).

Counsel is ineffective where the assistance "was objectively unreasonable under prevailing professional norms." United States v. Mercedes-De La Cruz, 787 F.3d 61, 67 (1st Cir. 2015) (cleaned up). Courts

apply a strong, rebuttable, presumption that counsel's choices fell within a wide range of reasonable professional decisions, all of which might be viewed as strategically sound under the circumstances. See Miller, 77 F.4th at 6. Only where "counsel's choice was so patently unreasonable that no competent attorney would have made it" will the assistance be deemed deficient. Flores-Rivera v. United States, 16 F.4th 963, 969 (1st Cir. 2021) (citing Rossetti v. United States, 773 F.3d 322, 327 (1st Cir. 2014)).

In reviewing an ineffective assistance of counsel claim under § 2254(d), I must provide two levels of deference, giving both the state court and the attorney the benefit of the doubt. See Pena v. Dickhaut, 736 F.3d 600, 606 (1st Cir. 2013) (noting that overcoming these two levels of deference is "extremely difficult" for a habeas petitioner). In reviewing petitioner's claim, the inquiry is not whether counsel's performance fell below the Strickland standard, but rather whether the state court's application of the standard was unreasonable. See Jewett v. Brady, 634 F.3d 67, 75 (1st Cir. 2011); see also Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007) (noting that "an ineffective assistance of counsel claim is a mixed question of law and fact" reviewed under the unreasonable application section of § 2254(d)(1)).

I take up each of Denson's claims in turn and conclude that neither have merit because both arise from tactical decisions made by counsel that are subject to substantial deference.

26

### a.    Decision to Call the Expert Witness

Denson claims that "no reasonable tactical decision could support calling a witness" who the attorney had reason to know would be susceptible to impeachment by the prosecution. Doc. 18 at 39-41. Although it is undisputed that Attorney Miles was well aware of Bernstine's three negative performance reviews when he chose to call him as an expert witness, Attorney Miles testified that he called Bernstine based on his impressive credentials in DNA testing and on the recommendation of other attorneys. Doc. 14-1 at 507-09.

In considering Denson's appeal of the trial court's rejection of his claim, the SJC disagreed with Denson's characterization of the nature of Bernstine's impeachment, concluding that it was not fatal to his testimony. Denson, 489 Mass. at 151-52. The scope of the questioning on his three negative performance reviews was brief, and Denson's counsel attempted to rehabilitate Bernstine's credibility by drawing out the details underlying the negative reviews and distinguishing them from the investigation in Denson's case. Id. at 152. The SJC found that it was reasonable for Attorney Miles to believe that Bernstine's "baggage" was outweighed by his scientific knowledge of blood splatter analysis and experience working in a state crime lab. Id.

27

Additionally, Bernstine's criticism of the methods used to investigate the blood found in the SUV fit into the overall theory of defense that the victim's blood was somehow deposited in the back seat of the vehicle and had not come from Denson. Id. Finally, co-counsel's disagreement with the decision to call Bernstine rested on the view that it was bad strategy, but the SJC noted that "[a]n unsuccessful defense strategy does not amount to ineffective assistance of counsel, even if different strategies were available or conceivable." Id. (citing Commonwealth v. White, 409 Mass. 266, 272 (1991)).

I conclude that the state court did not unreasonably apply Supreme Court precedent in determining that counsel's performance was not deficient for calling Bernstine as a witness. Attorney Miles made a strategic decision, believing any risks in Bernstine's professional record were outweighed by the benefits of his testimony to the overall defense. As such, his decision is subject to considerable deference. Strickland v. Goguen, 3 F.4th 45, 60 (1st Cir. 2021) ("Regarding hiring experts, the Supreme Court has noted that '[r]are are the situations' where courts will find counsel ineffective for making 'tactical decisions' about hiring or even for 'failing to consult or rely on experts.'") (quoting Harrington v. Richter, 562 U.S. 86, 106 (2011)).

### b.    Theory of Defense

Denson also claims that Attorney Miles's failure to pursue a "secondary transfer" theory was manifestly unreasonable and deprived him of an

effective defense. Doc. 18 at 41-44. Attorney Miles tried to create reasonable doubt about the blood evidence by suggesting two possible explanations for how the victim's blood could have ended up in the SUV: that either Denson, although not the murderer, had been close enough to the victim during the stabbing to have been splattered with the victim's blood; or, that the blood had been planted to falsely implicate Denson. Doc. 14-1 at 507-09.

This strategy was consistent with evidence presented at trial. The nightclub manager testified that he threw a "troublemaker" out of the main entry door prior to the stabbing and threw the assailant out of the mailbox door. Doc. 14-10 at 107-08. Hudson testified that she saw the Denson get tackled outside the mailbox door and then run toward the gas station. Doc. 14-11 at 36-37. Several other witnesses who did not know Denson testified to this version of events as well, stating that the assailant left the club through the mailbox door after the stabbing and ran toward the gas station. Doc. 14-8 at 44, 48-49.

The theory Denson argues his counsel should have pursued is that Denson was the "troublemaker" who had been thrown out of the club through the main entry door prior to the stabbing and that Denson got the victim's blood on him while lingering outside the club through secondary transfer by brushing up against people who had been directly splattered. To support this theory, Denson points to evidence provided by Alvarado, who testified that

she had seen Denson get thrown out of the main entry door. Doc. 14-11 at 74-75.

Attorney Miles testified that he chose not to pursue this secondary transfer theory because he believed it placed Denson too far away from the stabbing to plausibly have gotten blood on himself. Doc. 14-1 at 507-09. The defense strategy he chose—putting Denson within a five-foot radius of the stabbing while casting doubt on whether he was the assailant—explained the source of the blood while leaving open the possibility that Denson was innocent. Id. The SJC concluded that the overall strategy and decision not to pursue the secondary transfer theory were not manifestly unreasonable. Denson, 489 Mass. at 153. Because the SJC found that counsel was not in error for either of the decisions Denson criticized on appeal, it did not reach the question of prejudice under the second prong of the Strickland analysis. Id. at 152-53.

The SJC did not unreasonably apply the federal ineffective assistance of counsel standard to defense counsel's decision not to pursue this alternate theory. The record supports the SJC's view that the weight of the evidence put Denson inside the club at the time of the stabbing. Even if defense counsel's decisions ran afoul of Strickland, which they did not, Denson has failed to show that the SJC unreasonably applied Strickland.

**B.    <u>Substantial and Injurious Effect</u>**

Even if Denson could meet his burden of proof in showing that the SJC unreasonably applied Supreme Court precedent, such a finding, by itself, cannot support a claim for relief unless the petitioner can also show that the error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (cleaned up); see also Connolly v. Roden, 752 F.3d 505, 506 (1st Cir. 2014). As the SJC noted, the evidence produced at trial pointed strongly to Denson's guilt:

> Hudson, who knew the [petitioner] personally, testified that, while she was standing outside, she saw the [petitioner] being thrown out of the club through the mailbox door. She did not see anyone else being removed between the time when the [petitioner] left and the time when Shea came outside. Multiple witnesses testified that the club owner ejected the assailant through the mailbox door and that the victim left through the same door moments later. Blood spatter on the mailbox door and the testimony of witnesses inside the club confirmed that the victim and, therefore, the assailant, both had left through the mailbox door. In addition, the club owner testified that, before the stabbing occurred, he ousted the person identified as a troublemaker via the main entry door, not the mailbox door. The evidence also showed that Shea chased the assailant as he fled to the gas station and suggested that the [petitioner] was being chased when his cousin saw him approaching the gas station. This evidence, combined with the blood found on the door handle and in the rear seat of the SUV, presented a strong case that the [petitioner] was the assailant. Finally, in his closing argument, the prosecutor explicitly relied on the identifications of the [petitioner] by individuals who knew him, not individuals, like Shea, who did not know him and who testified only to their observations of the assailant.

Denson, 489 Mass. at 147-48.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, I deny Denson's petition for a writ of habeas corpus. Doc. 1. It being the opinion of this Court that no substantial question would be presented for decision on appeal, the Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2). The clerk shall enter judgment in accordance with this Memorandum and Order and close the case.

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge
Sitting by Designation

December 2, 2024

cc:    Counsel of Record